This is a hearing requested by Mr. Tirado to respond to the order to show cause that the court issued concerning the quality of practice by Mr. Tirado. So why don't we start with an appearance of counsel for Mr. Tirado. Good afternoon, Your Honor. Megan Zavier for Mr. Tirado and my co-counsel Joshua Bender is also present. I see both of you on the screen and I see you, Mr. Tirado, and I also have on my screen Benjamin Weisinger. I hope I pronounced that right. Weisinger, Your Honor. Good afternoon. Thank you for correcting me. Good afternoon, Your Honor. And you can also see my assistant, Ed Schiffer, who is also appearing. So I have read the submission, the response of the order to show cause. I have reviewed the order to show cause itself in the submission. And I would like to know at this stage, counsel, have you thought about how you wish to proceed today? Yes, Your Honor. I have just a very brief statement I'd like to make to the court. And then Mr. Tirado and also both of us as counsel, myself and Mr. Bender, would like to make ourselves available at your disposal to answer any questions we may have left unanswered in our written submissions. And Mr. Weisinger is also here as Mr. Tirado's mentor. He has gone to assist him on his Ninth Circuit matters. And we thought it might be useful if you had any questions for him regarding what he's willing to do in terms of mentoring Mr. Tirado. So we'd really like to open the floor for you so that we can answer any issues, any questions that you may have. Okay. I appreciate that. And I'm happy to have you give whatever statement you wish to make. I do want to assure you that I have carefully read the submission that you made. And so you don't need to repeat anything, but I obviously understand that you want to summarize. So why don't we begin with your opening statement, and then I'll have some comments after that. Okay. Thank you, Your Honor. And I am very cognizant of the fact that you've read all that we submitted, and it was quite voluminous. So I will not repeat at any length the materials there. But I do just want to highlight for you that Mr. Tirado is truly an ideal client for Mr. Bender and me. I have never, in my years of practicing bar defense and other ethics issues, I've never had a client who gets an OSV and devotes himself so completely to remedying the situation that led to it, like Mr. Tirado has done. Honestly, he's made it so Mr. Bender and I really just have to present to you what he's done. He did the work for us. He's lived, Mr. Tirado has lived and breathed this OSV since it came down on November 4th. He completely cleared his calendar for a month and sat down to dissect and analyze both the OSV and every single case mentioned in it. He's taken the appropriate action on every single one of those cases, from rewriting and refiling the substantive briefs to simply dismissing cases that warranted it and providing refunds to clients, to finding other avenues of relief for his clients. He's done the right thing by both the court and his clients in every one of those cases since the OSV came down. He also brought on board Mr. Wiesinger as a mentor to review all of this with him and to commit to helping Mr. Tirado on an ongoing basis. That's a significant boost to his ability to practice before this court. Then he went back to learn in greater detail how to effectively practice here in the Ninth Circuit. He's taken over 12 hours of CLE and reviewed the court's educational materials on its website, which are really in-depth and useful to a practitioner. And finally, he cleaned up his office staff and replaced non-lawyer staff with attorneys and made the changes he needed to make to have the right team around him. And I'll mention that he continued all of these efforts even when he came down with COVID about two weeks ago, about 10 days to two weeks ago. So that didn't stop his efforts and it didn't lead him to seek a continuance of this hearing or otherwise delay. These were such important issues that he continued to work through that. And given the remedial actions that he's taken, we ask the court to at least consider whether what he's already done is sufficient to discharge the OSC. And if it's not, then we ask the court to impose no more than an admonition on him. But at this time, we want to open ourselves up to you to answer any questions you might have that we perhaps failed to address in our submissions or maybe something we said in there has raised a question for you so that we can be here to answer everything that comes to mind for you. Thank you, counsel. Mr. Tirado, my first question to you is, are you able to participate in this hearing given your COVID status? Yes, Your Honor, I am. Thank you. Well, I'm glad to hear that. You look fine. I hope you're not suffering any symptoms that are debilitating. Just fever, but I feel okay. Okay. Well, I'm sorry to hear that, and I wish you a speedy recovery. Thank you. So I'm going to ask some questions, but what I'd like to do, Mr. Tirado, is have Mr. Schiffer administer the oath so that the answers to the questions will be sworn testimony. Absolutely. So let me turn it over. Ed? Yes, hi, Mr. Tirado. Would you raise your right hand? Do you affirm the statements you're about to make are the truth, the whole truth, and nothing but the truth, and that you offer them under penalty of perjury? I do. Okay. Thank you. So I, just to recapitulate what you stated, I understand that you obtained your legal training in Mexico, and completed that program at the University of Monterrey in 2000, and then obtained an LLM in international trade law at the University of Arizona in 2002. You were admitted to the Arizona Bar in 2004. Is that correct? That is correct, Your Honor. All right. Now, the next piece of information that I see from your submission is that you were employed by the Windsor Law Firm in 2007. And so my first question is, what did you do between 2004, when you were admitted to the Bar, and 2007? That's a good question. I worked briefly in Maryland in a firm, and I was doing just work business, just business immigration law. And I worked there for less than a year. That was in Maryland? In Maryland, yes. So that was one year, and the rest of the time between 2004 and 2007 was unemployment? I was working on the family business in Mexico. I'm sorry. I couldn't understand that. I was working on the family business in Mexico. On the what? Family business. Oh, family business. Okay. Thank you. And what kind of business is that? Agriculture. I see. All right. So then for the next five years or so until 2012, you were working with the Windsor Law Firm. And then according to a letter from Mr. Windsor, there was a period of time where you were a partner with him in a law firm that was called Windsor and Toronto. Is that correct? That is correct, Your Honor. It became Windsor and Toronto. And then at some point you left to open your own firm. That's correct. Was that 2012? Yes. We split the firm by the end of 2012. I see. All right. End of 2012, beginning of 2013. Okay. So I'm interested in understanding in this period of time from 2012 until the order to show cause issue. I'm interested to know how you organized your firm and who was responsible for doing the work before the immigration judge, who was responsible for appeals, and who was responsible for Ninth Circuit petitions for review? Good question, Your Honor. I was responsible for it, Your Honor, for the most part. I had a huge workload, Your Honor. I've had a few associates that left the firm, and I was responsible for handling for the most part of the individual hearings. Associates used to handle the master hearings until last year that I basically was the only one working there as an attorney, and I was handling a huge workload over there. And recently I was relying so much on non-attorney staff who was underperforming, and I decided to replace them with attorneys. So were the clients that you represented in the Ninth Circuit, generally clients you had also represented in the Immigration Court and in the Board of Immigration Appeals? Some of them do, Your Honor. Some of them is just me. With some of them, I was representing them at the IJ. Okay, but now I'm just talking about the cases that were in the Ninth Circuit. The cases that you litigated in the Ninth Circuit, were those cases generally for clients that you had also represented in the Immigration Court and the Board of Immigration Appeals? For the most part, yes. With the exception of a few ones, for the most part, yes. All right. When you had a client that you represented – well, let me ask you this question. If you had a client that came in and you signed an initial retainer agreement, did that initial retainer agreement contemplate fees that would be charged for appeals to the Board of Immigration Appeals or to petitions for review to the Ninth Circuit? Only if it's a Ninth Circuit case. If it's a case, for example, a cancellation of removal, we only contemplate fees for the initial step, which is the cancellation of removal. Okay. Sorry, I didn't mean to interrupt. But once you got a decision from the immigration judge, would you then have a conversation with the client, if it was appealable to the BIA, about whether the client wanted you also to represent them at the Board? That's correct. When we get a decision, we call the client. If the client doesn't answer, then we mail a letter to him and we make the decision. And then would you execute a new agreement with a new fee structure for the appeal? That is correct, Your Honor. Yes. And would that same process occur after the BIA decision came out? Would you then again confer with the client? And if the client chose to litigate further, would you execute a new agreement and charge a new fee for petitioning for review at the Ninth Circuit? That is correct, Your Honor. And in most cases, we know that they have problems in getting lawyers. They don't have many resources, and we give them a fee agreement with them. Okay. So, in the Ninth Circuit, was there a flat fee that you charged for the Ninth Circuit representation? Or was it a tiered fee structure if you had to file a brief that you would charge so much? If there was an oral argument, you would charge so much, etc.? It was a flat fee, Your Honor. And to be honest, I was charging low bono fees for this. In some cases, I only charged $1,000, $2,000 for those cases, Your Honor. All right. Okay. So, you talk about the errors you made, talk about not familiarizing yourself sufficiently with the nuances of Ninth Circuit practice, and you talk about over-reliance on the paralegals. Correct. So, let me see if I can understand what happened in the Alvarez case in terms of how you utilize paralegals in that case. Let's start at the Board of Immigration Appeals because I think there was some, I think I recall some statement about a paralegal or from a paralegal about what occurred there in the BIA with the initial sin, the original sin of the briefing at the BIA that was inaccurate, referred to an incorrect person. First of all, I'm truly embarrassed for what happened there. I'm truly remorseful. What happened there, I was assisted by a paralegal in the preparation of that brief, and I have called him, and I assume my responsibility for it. I know it is my duty to supervise. And what happened is he's certain that he prepared the right brief in that case, but he accidentally printed the wrong one, and I mistakenly signed it. I allowed myself to be overwhelmed. I truly have done that, and I'm truly sorry about it. It was a big mistake. It was the biggest mistake in my legal career, and it will never happen again. So, let me probe a little deeper into that. When you say that the paralegal prepared the brief, to what extent did you delegate responsibility to the paralegal for the briefing? In that case, that particular case, I told him what the legal arguments were, what to be arguing, and what he said is that he was working on another brief from a client from Guatemala. And he may have confused it or made a copy-paste error, and he printed the wrong brief. Actually, it is my mistake. I was negligent, and I will never do that again in my life. So, was it his responsibility to compile the brief? It was his responsibility to, in some cases, it was his responsibility to draft the briefs, and I was supposed to review them incorrectly. In this case, I accept my mistake. I was negligent. Okay. It was a big mistake. Okay, so that mistake. But you realized that a mistake had been made when the BIA issued its decision. In this case, Your Honor, I realized that a mistake was done when I received the order to Joe Costner. I was completely overwhelmed with work. I was working with a huge workload by myself. I didn't have the right professionals on my side, and I have undertaken steps to fix this, Your Honor. I have replaced the non-performance staff with two experienced lawyers. Your submission is a little ambiguous about when you realized that the wrong brief had been filed with the BIA. Your declaration suggests that you realized it right away, but you considered and rejected trying to rectify things at the board. So I'm trying to understand, did you not read the board's decision in that case? Your Honor, I did not. I'm really sorry about it. It was, as I told you, the biggest embarrassment that I have suffered in my legal career. So you didn't read the board decision, yet you filed a petition for review at the Ninth Circuit. And I relied on the words of the paralegal in this case, Your Honor. Okay. That's pretty shoddy practice, Mr. Tirado. Your Honor, that way I'm doing changes, Your Honor. All right. The other error you talk about was that you were unfamiliar with the nuances of Ninth Circuit practice. It's kind of a curious use of the word nuance. Did you ever review the Ninth Circuit rules to see what was required in a brief? Briefly, Your Honor. And after I got the OSC, I have taken CLEs, and I have read all of the materials at the Ninth Circuit website, Your Honor. And I have come to realize that many of my filings have mistakes, especially jurisdiction. Your Honor. It seems to me that an attorney would consider the rules of a court and how you navigate a court to be more than nuances. That seems to be required of anybody appearing in a court to figure out what they have to do in order to successfully present their case and be an adequate advocate. And as the order to show cause points out, in every case you filed in the Ninth Circuit before the order to show cause, there was some deficiency. And this is not simply only a matter of being an effective advocate and complying with formal rules, all of which have some basis in actual need. The Ninth Circuit is a court that is overloaded. It has a huge backlog of cases. And so when cases come in, three different judges are tasked with the responsibility to review the briefs and record and then make a decision. That is an enormous amount of an extremely valuable resource. Not to mention each of them have staffs. They have judicial assistants. They have law clerks. The court has its own staff, staff attorneys, clerks, paralegals, all of whom devote time to every single appeal, every single petition for review. And when an attorney doesn't comply with court rules, it's a burden on the court. Sometimes the court takes extraordinary steps to try and figure out what's going on to do justice. But that's the expenditure of additional valuable time that could be spent on other cases. So here we have all these cases that you filed that the court is spending a whole lot of time on instead of on other cases where the lawyers have done the job correctly and presented the case that the judges can decide. So this is a serious matter. And I appreciate that you were unaware and that this was not an intentional problem. But the level of incompetence here is extremely troubling. Incompetence in the appeals court. I don't doubt that you've been an effective advocate in immigration court. The submissions by your clients and by the legal community are impressive and show that you've done a very good job as an immigration lawyer. But you have failed at the court of appeals until the order to show cause. Yes, Your Honor. If I may say something, I have met with all of my clients, and I understand the court has limited resources and has a huge workload. That's why I have decided to dismiss voluntarily with client's consent the cases that are not warranted at the court. I have met with them. I have refunded all the fees to the clients. In other cases, they have other avenues. I discovered that some of them have been victims of crimes. I'm processing U visas for them. Others are getting married to U.S. citizens. I will process the equal share of processing for them. And to those who just decided to accept the dismissal, I have just refunded the cases to them. Because I have realized that many of those cases, the BIA should have been the last stop. That's why I have a mentor as well. The mentor is willing to help me. He's been supportive, and he has reviewed the cases with me as well, Your Honor. I know that what has happened is not reflective of my capacity to practice law, Your Honor. And I'm asking for an opportunity to prove to this court that I can practice effectively at this level. And I'm committed to fix my appeal practice. Okay. Let me go back to the Alvarez case just for a moment. I have a question about when did your firm withdraw from the case at the merits level? Yes. If I'm not mistaken, we withdrew a few months before the individual hearing. Because he had an overdue balance. He talked to me. He said that he was having financial problems, and we decided to represent him again. And then Mr. Weinstein came in and did the hearing? I talked to him, and he told me that he wasn't that affected here. Right. And recently, I discovered that he was a crime victim, that he was a victim of domestic violence. He didn't disclose that before because he didn't want to say anything negative about his ex-wife. But he was a victim of a very brutal domestic violence. I contacted the Cottonwood Police Department. They signed the B Supplement Certificate, and the U of E is standing right in our yard. So, there were a number of instances where the government filed a motion to dismiss, pointing out deficiencies in the briefing. Did that ever raise a concern with you about whether you had raised issues adequately? Yes, it did. And I was frustrated at the same time with the legal landscape, especially cancellation of removal. We have a very high standard. And sometimes you try to help people, but in order to prove extreme and unusual hardship, it's a very high standard. And sometimes you feel like that you have a good case, and you don't. But also, I have to learn to stop. If a client wants representation, and if the argument is hardship, I should say no. And in many of those cases, I was trying to help him. It was not the right strategy, but you're correct. So, the government would say, well, he hasn't identified the basis for the argument. He's just filed this boilerplate, or it doesn't even apply to this case. He says this case is about X, but it's actually about Y. And so, we move to dismiss, because he hasn't supported his arguments with analysis. Did that raise a concern with you? It raised some concern, Your Honor. But the order to choke us was the biggest wave that boiler. Once I got this, I've been committed 24-7 to fix my practice. I have cleared my schedule, and I have dedicated myself to improve this appeal practice. So, tell me about what you've now learned in the course of the programs you've taken. Let's talk about briefs. What are the important components of a brief? What are the things that you need to do going forward that you may not have done adequately in the past? A lot, Your Honor. A lot. First step is we have to determine what is the dispositive issue. First of all, we have to determine how the case got to the United States. That's the first step. Second step, we have to determine jurisdiction, Your Honor. I have come to learn that even if I don't agree with the 42B rules, the court, according to the Real ID Act, doesn't have jurisdiction to review petitions for harming. So, that's the first step. And also, exhaustion. We have to take a look at the BIA briefs to see if all arguments have been exhausted, both at the BIA and the court level, Your Honor. Those are the big issues that I have learned. Well, I would also add that you need to very carefully review the decision of the BIA, which is what's at issue in the Ninth Circuit. Absolutely. And for this reason, from this day forward, I'm going to limit my practice in the United States to five cases until I feel more comfortable with my appeal practice. I will plan to increase it gradually. But from now on, I will leave my five cases to be the cases that I should be taking. And I have a mentor now who's willing to support me. And I have added another lawyer at the office who has a Ninth Circuit license. He will help me as well to supervise this practice. And I have added a lawyer whose name is Esperanza Pervoso. She will take a huge portion of my workload at the court level. So I will have more time to focus on this appeal practice. Okay. So do I understand you to say that you will limit your number of pending Ninth Circuit appeals to five at any one time? Right now, I only have five. I have filed motions to dismiss the rest of them. And for now, I will limit the practice to five cases at most until I feel more comfortable with this practice, until I feel I have learned more. Okay. So why don't you review for me what arrangement you've made with Mr. Wiesinger about giving you mentorship on Ninth Circuit cases? That's correct. When I got this order to Chonkas, I called him. I have known Mr. Wiesinger for about 10 years. And he is known to be one of the best Ninth Circuit practitioners for immigration in the Phoenix area. He has been part of published decisions. I explained to him the situation. And he gladly accepted to help me. He has reviewed the files with me. And I have filed two more briefs under his supervision. If you take a look at those briefs, Your Honor, the quality is much better, actually. And those briefs were done under his supervision. And he has been a great help to me.  Let me turn to Mr. Wiesinger for a moment. Thank you for appearing today. Why don't you fill me in on what your expectation is, what you've been doing, what you expect to do in the future in your role as mentor?  Your Honor, one of the first things that I talked with Rafael about was one of the concerns raised in the order to Chonkas and the lack of citations to the record. And it's one of the first things that my mentor taught me, Mr. Pope, taught me was that, hey, the judges know the law. The clerks know the law. The record is your opportunity to introduce your client to the court. And that knowing your record and having a good review of the record and citing to the record may actually be just as important, if not more important, than the boilerplate you're using, even if the boilerplate is correct in your briefing. And so that was one of the first lessons that I taught him. And he's really taken to it. And so what I'm going to continue to do for him is I haven't completed yet reviewing all of the pending matters on which Mr. Tirado is currently counsel. But I'm intending to do that over the next, you know, few weeks and months, however long it takes to do that and to suggest either dismissing even more cases or requesting additional briefing, you know, motions to file amended briefs in other cases. And again, we're just a few weeks into this, so I haven't had time to do it all yet with him. But I want to give him the tools that he needs to be an effective litigant before the Ninth Circuit. OK, thank you. OK, well, I want to thank counsel and Mr. Tirado for your submissions, Mr. Wiesinger for your participation. So, Mr. Wiesinger, I did see the two briefs that were attached to the response to the order to show caution. And I think Mr. Tirado said that those briefs were ones that you had helped him with. Are there other pending briefs that you've worked on together? Well, actually, right now we're working on the matter of Odom versus Barr and get the case number here. That's the one that's due the 18th. That's correct, Your Honor. We were actually talking about it last night, talking about case strategy regarding whether to proceed with briefing or to see if oil might be willing to mediate the matter based upon her marriage to a U.S. citizen and the fact that there's an I-130 pending and exploring that as a possibility. Because as I told Mr. Tirado, frankly, the credibility issue in her case, in my opinion, is insurmountable. Her testimony was so scatterbrained. And this was before Mr. Tirado even touched the case. I think she had shot herself in the foot by claiming that Boko Haram had threatened her in 1982 when it didn't even exist until 2002. Sometimes our clients do these things and we're left picking up the pieces. But, you know, as I was suggesting to Mr. Tirado, we could keep going on this and file a brief and simply waive the asylum and withholding issues on the credibility grounds and argue that she could still meet her burden for protection of the convention and torture because you don't need to be credible necessarily to be granted cat relief. But even that, under the circumstances, is pretty unlikely. So we still haven't made a decision as to whether we're going to file the brief or talk to OIL about mediation in this case. So that's the next case that's on our docket and then we'll move forward after that. So, Mr. Tirado, you're both familiar with the Ninth Circuit Mediation Program? I am not, Your Honor. But, Your Honor, I believe you and I met when you were a mediator, right? I was never a mediator. Oh, was there a different Peter, I think? There was. Yes. Peter, also with the last name beginning with S. Right. Last name, Sherwood. Peter. Sherwood. Thank you. Pete Sherwood. He was a mediator, but no. Okay. Sorry. I have mediated, but I have never been a mediator, a court mediator. The court has, on occasion, referred a matter to me to mediate rather than to the court mediators. I'm sorry for the confusion. Yeah. No, that's fine. Understandable. The computer staff always got us mixed up, too. Sometimes I would go to a different courthouse and I would try and log in and they had assigned me Pete Sherwood's login information. I wasn't able to get in. All right. So, counsel, is there anything further that you want to add at this stage? I did hear your plea for mercy, and I will take that into consideration. Your Honor, can I add something? Yes, you may. Mr. Tirado isn't the only attorney that I've mentored. This is my first time mentoring officially. And Mr. Tirado, in my opinion, kind of fell victim to what a lot of other immigration lawyers fall victim to, is that the ease of this learning the practice of immigration law before the immigration courts kind of lulls one into a false sense of security that you can kind of do it. You can kind of do it on your own and learn as you go. And clearly, he's learned his lesson that that's not the case, that if you're going to seriously practice at the Ninth Circuit, you need to learn the rules, you need to do your due diligence, and you really do need someone to mentor you. So that's why I'm happy to do this for him. Thank you for that insight. It's valuable information for me. All right. So the next step is I will be issuing a report and recommendation about the appropriate outcome here. We'll serve that on you, and you'll have an opportunity to file comments or objections. Today is December 16th. In 15 days, I will be retiring. So... Congratulations. Thank you. I'm very much looking forward to that. So if I may, if you find... If it's possible to respond quickly to this reported recommendation, that will enable me to complete my work before my retirement, and I would like to do that. So... I don't think I'm going to have to say anything more about that, but I urge you to do that if it's at all possible. I realize it's a difficult time of year to be making that request, although now with the current situation, I guess people aren't doing the usual kinds of things that one would do at this time of year, and there's a lot more time to devote to this kind of thing. So before I sign off, Mr. Tirado, I do want to commend you on your work as an immigration lawyer, and spank you for your work at the Court of Appeals. I think I've spanked you enough for that. But I also don't want to end this without telling you that the steps you've taken since the Order to Show Cause are impressive, and this is what I would have hoped a lawyer would do. It's the kind of thing that we ask lawyers to do in response to an Order to Show Cause, when we do a reporting recommendation. The fact that you've done this in advance is very good news for me, and it gives me a great deal of optimism that no matter what the outcome is here, I think that your future prospects are rosy in terms of your legal career, and I urge you to keep your eyes on the prize and continue to do that. Thank you, Your Honor, and I will continue to keep working harder, Your Honor. Thank you so much. All right. All right. Is there anything else from counsel? No, Your Honor. Anything else, Mr. Toronto? No, Your Honor. Thank you very much. Okay. Mr. Wiesentritt, thank you for appearing also, and that will conclude. This matter will be submitted for the preparation of a reporting recommendation. I think you can expect it fairly quickly. Okay. Thanks, everyone. Happy holiday season. You too. Happy holidays. You too. Thank you. Bye-bye. Thank you, Mr. Schiffer.
judges: Appellate Commissioner Shaw